IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

WILLIAM C. TURNER,              )     CRIM. NO. 16-00207 SOM
                               )     CIV. NO. 20-00286 SOM-KJM
              Petitioner,       )
                               )     **ORDER DENYING DEFENDANT'S**
          vs.                   )     **PETITION FOR WRIT OF ERROR**
                               )     **CORAM NOBIS AND DENYING**
UNITED STATES OF AMERICA,       )     **MOTION TO STRIKE AND BAR**
                               )     **CONSIDERATION**
              Respondent.       )
                               )
_____ )

**ORDER DENYING DEFENDANT'S PETITION
FOR WRIT OF ERROR CORAM NOBIS AND
DENYING MOTION TO STRIKE AND BAR CONSIDERATION**

I.        INTRODUCTION.

          Defendant William Clark Turner got into a dispute with

other passengers on an American Airlines flight from Dallas to

Honolulu on March 14, 2016.  At one point, he threatened to

break a passenger's neck.[1]  A flight attendant intervened.

Ultimately, Turner was charged with having assaulted two

passengers and with having interfered with the performance of a

flight attendant's duties.  A jury acquitted Turner of the

assault charges but found him guilty of the interference charge.

Turner was sentenced to a term of probation.

          Turner appealed, and the Ninth Circuit affirmed.  In

its opinion, the Ninth Circuit noted that the evidence showing

_____

[1] At trial, Turner admitted having threatened to break a
passenger's neck, although there was a dispute about whether the
threat included profanity.  ECF No. 97, PageID # 991.  All ECF
and PageID references are to Crim No. 16-207, rather than to the
companion civil case.

that Turner had intentionally intimidated the flight attendant was overwhelming.  *United States v. Turner*, 754 F. App'x 664, 665 (9th Cir. 2019).

Turner, having completed his sentence, now asks this court to issue a writ of coram nobis.  The writ allows courts to correct errors of a fundamental character that a defendant could not have raised earlier.  Turner has not identified any such error.

His first argument is that his attorney should have told him, during plea-bargaining negotiations, that pleading guilty to a misdemeanor assault charge might have less of an impact on his career than a conviction on the felony interference charge.  Turner, a physician then practicing in Texas, was offered a plea agreement in which he was to plead guilty to a single assault charge, with the Government dismissing the other charges.  He rejected the deal only to be convicted of the interference charge, a felony.

His second argument is that his attorney was ineffective in failing to object to the jury instruction defining intimidation, an element of an interference charge.

Both assertions lack merit.  The effect that a conviction might have on a medical license is a collateral matter, and Turner's attorney had no duty to advise him on that issue.  In addition, Turner does not establish error in any jury

2

instruction.  Even if he could be said to show error, he fails to show prejudice.  Turner's petition for a writ of coram nobis is denied.

II.      **BACKGROUND.**

      **A.   Turner's Conduct.**

While some of the details are disputed, the witnesses at trial agreed on certain basic facts.  During an American Airlines flight from Dallas to Honolulu on March 14, 2016, two women passengers, C.M. and R.A., began talking to each other across an aisle.  Turner, who was sitting next to his girlfriend (now his wife), was on his way to what he expected to be a vacation.  Annoyed by the volume of the women's conversation, he stood up and confronted them.  At some point, he told R.A. that he was going to "break her neck" or "break her fucking neck."  A flight attendant, Lena Goralska, intervened, and the two women were moved to new seats.

      **B.   The FBI Investigation and the Indictment.**

When the plane landed, the Maui police and the FBI interviewed several passengers (including R.A., C.M., and C.M.'s husband), Goralska, Tamara Thompson (Turner's girlfriend), and Turner himself.  *See, e.g.*, Def's Exs. 2, 3, 5, 7, 13.[2]

---

[2] In this district, exhibits received in evidence at a trial or evidentiary hearing are retained by counsel, whose responsibility it is to provide them if notified by the Clerk of

According to the FBI case agent, Turner, throughout his interview, "was extremely animated and appeared to be constantly agitated."  Def's Ex. 7 at 2.  After the interview concluded, the case agent arrested Turner, and he spent one night in jail. *Id.*

On March 23, 2016, the Government filed an indictment that alleged that Turner "assault[ed] and intimidated" a flight crew member (a copilot) and a flight attendant (Goralska) and assaulted two passengers (C.M. and R.A.).  ECF No. 8, PageID # 20-21.  The indictment charged Turner with one count of interference with a flight crew member and a flight attendant under 49 U.S.C. § 46504 (Count 1) and two counts of assault under 18 U.S.C. § 113(a)(5) (Counts 2 and 3).  *Id.*

After returning to Texas, Turner, on May 14, 2016, sent an email to the FBI stating that he wanted to make a complaint about the case agent "for gross negligence of duties, to the point of [being] a rogue agent."  Def's Ex. 14 at 1. Turner believed that it was "totally unacceptable" that the FBI agent threw him in jail "when a 6th grader could have done a better investigation."  *Id.* at 2.

---

Court that the appellate court has requested them.  Those exhibits are therefore not available on the electronic docket.

### C.   Pretrial Proceedings.

Shortly after the indictment was filed, the Government offered Turner a plea deal.  If Turner agreed to plead guilty to one count of misdemeanor assault, the Government offered to dismiss the other misdemeanor assault charge and the felony charge of interference with a flight crew member and a flight attendant.  Def's Ex. 25; *see also* ECF No. 148-1.  Turner rejected the proposal.[3]

According to Turner, he did not want to accept the deal for two reasons: (1) he believed even a misdemeanor conviction would cause him to lose his Texas medical license, and (2) he believed that he was not guilty of any of the charged offenses.  Turner says that his attorney did not explain to him that he was likelier to be able to maintain his Texas medical license with only the misdemeanor conviction offered in the plea deal than if convicted of the felony interference charge.  He claims that, if only he had known that, he would have accepted the deal.

_____

[3]   The Government stated that its initial plea offer would expire on July 5, 2016, at 5 p.m.  Def's Ex. 26; *see also* ECF No. 148-1.  However, it appears that if Turner "changed his mind and decided that he wanted the [plea]" he could have accepted it as late as February 6, 2017.  *See* ECF No. 198, PageID # 2110.

      D.    **Testimony at Trial**.

For the purposes of the present motion, the most important trial witnesses were Goralska, C.M., R.A., and Turner. Those witnesses provided the following testimony.

**Goralska.**  Goralska stated that she was one of seven flight attendants aboard the flight from Dallas to Honolulu. ECF No. 95, PageID # 617-18.  Approximately four hours into the flight, another flight attendant told Goralska that passengers were arguing in the aisle.  *Id.* at 620-21.  Goralska "went up to . . . investigate what was going on."  *Id.* at 621.

According to Goralska, she discovered Turner yelling at C.M. and R.A.  *Id.* at 621.  Turner, apparently upset that the two women were talking too loudly, was telling them that they "didn't know how to keep their . . . F'ing mouth shut and that they didn't know how to F'ing behave on the plane."[4]  *Id.* at 623. Goralska testified that she tried to defuse the situation by getting Turner to return to his seat but he initially refused. *Id.* at 623-24.  "It took a good . . . 10, 15 minutes to just get him to sit down."  *Id.* at 624.

Once Turner sat down, Goralska spoke to R.A. and C.M. Goralska recalled telling them that she was not sure exactly how

---

[4] Goralska later explained, that while she used the letter "F" in her testimony because she was uncomfortable using profanity in court, Turner was actually saying "fucking."  *Id.* at 633.

the altercation had begun, but that, because the plane had almost reached Honolulu, she hoped there would be no further problems.  *Id.* at 628.  She said she also told them to "[c]ome get somebody quickly" if Turner resumed his antagonistic behavior.  *Id.*  She then returned to her duties.

Within five to ten minutes, however, another passenger came to the back of the plane and told her that Turner "was still complaining about the women and that he was engaging them again."  *Id.* at 629.  Goralska testified that, when she returned, Turner was "even more enraged."  *Id.* at 632.  She described his ranting as being "like a volley" and said he kept saying "[t]hey don't know how to keep their fucking mouths shut.  I'm going to break her fucking neck."  *Id.* at 632-33.  She said he also threatened to "kick [C.M.'s husband's] ass."  *Id.* at 633.  According to Goralska, while speaking, Turner was "moving his head back and forth, yelling from side to side, one woman to the other."  ECF No. 96, PageID # 701.  C.M. also told her that, before she arrived, Turner had "threatened them" and said that "he was going to break her F'ing neck."  *Id.* at 632.

Goralska recounted "becoming a little alarmed," because Turner was "not compliant at all and not responding to me at all."  ECF No. 95, PageID # 633.  She said that her concern grew when she saw Turner spit in the face of a passenger.  *Id.*  At that point, Goralska "was in shock," and she

"realized that [she] was unsure of what [Turner] was capable of doing." *Id.* at 634. Goralska said that Turner's demeanor was "volatile" and "very uncertain." *Id.* at 636. Goralska believed that Turner "was capable of doing physical harm to someone." *Id.*

Eventually, Goralska concluded that the only way to avoid further disruption was to move C.M. and R.A. to new seats, which she did. *Id.* at 634-35. As a result of the incident, Goralska was unable to answer call lights or help another flight attendant with a vomiting passenger, and she did not perform her usual cabin walkthrough. *Id.* at 640.

**C.M.** C.M. testified that she was going to Hawaii for a vacation. *See* ECF No. 96, PageID # 707. Approximately four and a half hours into the flight, C.M. began a conversation with R.A., who was seated across the aisle from her. *See id.* at 709; *see also* ECF No. 95, PageID # 625-26. The women had not previously been acquainted with each other. *See* ECF No. 96, PageID # 752. According to C.M., she was speaking in a "normal tone of voice" during the conversation. *Id.* at 710.

C.M. explained that during that conversation, she saw Turner, who had been sitting directly behind R.A., *see* ECF No. 95, PageID # 625-26, stand up and take his headphones off. ECF No. 96, PageID # 710. According to C.M., Turner "started swearing[,] . . . asking if we knew proper plane etiquette, and

[saying] that we were to keep our mouth fucking shut the entire flight." *Id.* C.M. said he repeatedly called her a "bitch" and told her to "shut the fuck up." *Id.* at 711. C.M. explained that Turner was using an "ang[ry] and aggressive" tone and speaking very loudly. *Id.* at 712.

C.M. remembered that, at some point, Goralska walked up to her and "asked what the situation was." *Id.* at 713. C.M. said that Turner then began speaking to Goralska and telling her that C.M. and R.A. "didn't have proper plane etiquette" and "didn't know how to keep [their] mouths fucking shut." *Id.* According to C.M., Goralska told Turner to "remain calm and just stay seated" and that the plane had almost reached Hawaii. *Id.* After Goralska intervened, Turner returned to his seat, and C.M. began whispering in her husband's ear to tell him what had happened. *Id.* at 713-14.

C.M. testified that Turner then "stood back up and said 'what part of shut the fuck up don't you understand?'" *Id.* at 714. She said that Turner "bent down to get in [C.M.'s] face," and he was "pointing his fingers" directly at her when he allegedly spat on her. *Id.* at 714-15. At the same time, he reportedly told C.M. that she was "a fucking bitch." *Id.* at 715. Turner was allegedly using "even more of an aggressive tone of voice." *Id.* C.M. recounted telling Turner "you just spit on me. Get out of my face." *Id.* at 715-16. According to

9

C.M., Turner responded by saying, "If that's the least I do to you, you better be fucking happy." *Id.* at 716. C.M.'s husband then intervened, and Turner reportedly told him that he was going to "kick your mother fucking ass when I get off the plane." *Id.* C.M. went to the bathroom to wash the spit off her hands and saw a flight attendant, who eventually moved her to a different seat. *Id.* at 717.

**R.A.** R.A. stated that she had been traveling to Hawaii to visit her husband, who had been working in Hawaii for three weeks. ECF No. 96, PageID # 750. About four hours into the flight, R.A. began a conversation with C.M. *Id.* at 752-53.

R.A. recalled that the conversation was quickly interrupted by Turner, who told them "I do not want to listen to your F'ing conversation."[5] *Id.* at 753. R.A. responded by telling Turner, "I didn't know that there were rules on an airplane," then, after she "sat back and thought about it" she turned around in her seat, pointed at Turner, and told him, "You are an asshole." *Id.* at 754.

Turner reportedly responded by getting out of his seat, walking over to R.A., and pointing his finger in R.A.'s face. *Id.* R.A. remembered telling Turner to get his "F'ing finger out of my face" and blowing at his finger to get it out

---

[5] R.A. likewise explained that Turner actually used the word "fucking." *Id.* at 753.

of her face.  *Id.* at 754-55.  Turner allegedly responded by telling R.A., "I'm going to break your fucking neck."  *Id.* at 755.  When R.A. replied by saying "not if I break yours first," Turner reportedly pushed the back of R.A.'s seat with his hands with enough force to "push [R.A.] into the seat in front of [her]."  *Id.* at 755-56.  Eventually, Goralska came over and got the situation under control, then moved R.A. to a different seat.  *Id.* at 757.

**Turner**.  Turner presented a very different version of what happened.  Turner testified that he was a doctor who worked in the emergency room in the East Texas Medical Center.  ECF No. 97, PageID # 944.  He had been traveling from Texas to Hawaii to take a vacation with his twin brother, their children, and his girlfriend.  *Id.* at 948-49.  Because of his work schedule, he usually slept during the day.  *Id.* at 951.  As a result, he had not slept the night before the flight.  *Id.* at 976.

About three to four hours into the flight, Turner was listening to music and trying to sleep when he noticed C.M. and R.A. conversing.  *Id.* at 950-54.  According to Turner, he "tapped on [C.M.'s[6]] elbow to get her attention," and asked her and R.A. to stop talking to each other because his girlfriend

---

[6] At trial, Turner referred to "the lady that's in [seat 27]C." ECF No. 97, PageID # 954.  According to Goralska, C.M. was in that seat.  ECF No. 95, PageID # 625.

was trying to sleep.  *Id.* at 954.  He stated that he maintained a calm demeanor and did not yell or use profanity.  *Id.* at 954-55.  He said that C.M. and R.A. refused to stop talking and essentially told him "we'll do what we want."  *Id.* at 955.

After C.M. and R.A. continued speaking, Turner "entered the isle and faced them" and said "hey, this is how loud you sound" to "give them an idea of what I was hearing." *Id.* at 955-57.  In response, Turner claims, R.A.[7] spat in his face.  *Id.* at 957-59.  Turner initially testified that he only responded by saying "you just spit in my face," *id.* at 959, although, on cross-examination, he admitted telling R.A. "if you spit on me again, I'll break your neck."  *Id.* at 991.  Turner denied having used profanity.  *Id.*

In any event, Turner asserted that C.M.'s husband then "yelled at [him] to sit down."  *Id.* at 961.  Because Turner thought C.M.'s husband was "going to come after" him, he "ended up sitting down at some point."  *Id.*  Shortly after Turner sat down, he stood up again, and Goralska walked over and "ask[ed] [him] to sit down."  *Id.* at 961-62.  Turner indicated that he attempted to tell Goralska what had happened, but she made an

---

[7] Turner claimed that the passenger in seat 27B spit in his face. Goralska testified that R.A. was in that seat.  ECF No. 95, PageID # 625.

"alligator motion" with one hand, presumably to indicate that he should stop talking.  *Id.* at 962.

Turner said he thought that Goralska was "hysterical," so he waited until she "wasn't way out of control . . . before asking her to move R.A. and C.M."  *Id.* at 963-64.  Goralska spoke with R.A. and C.M., but ultimately concluded that there were not any other seats available.  *Id.* at 964.  When she again spoke to Turner, however, he told her that allowing R.A. and C.M. to remain in their seats was "not acceptable" because R.A. had told Turner's girlfriend "your husband is a complete asshole.  You need to divorce him."  *Id.*  Following that conversation, Goralska moved R.A. and C.M. to new seats.  Turner denied hitting or kicking R.A.'s seat or spitting on C.M.  *Id.* at 965-66.  Turner believed that R.A., C.M., and Goralska had all "colluded" with each other to accuse him of wrongdoing.  *Id.* at 986.

### E.  Motion for Judgment of Acquittal.

At the close of the Government's case, Turner made an oral motion for judgment of acquittal.  With respect to Count I, which charged Turner with having interfered with Goralska and a copilot, the court observed that the Government had produced evidence supporting its theory that Turner had purposefully intimidated Goralska, but it had not presented any evidence showing that Turner had purposefully intimidated the copilot,

whom Turner had never seen.  ECF No. 96, PageID # 859; ECF No. 97, PageID # 895-97.  The court granted Turner's motion for judgment of acquittal "insofar as a portion of Count 1 related to intimidation of a pilot and interference with a pilot's performance of the pilot's duties."  ECF No. 97, PageID # 1007. The remaining charges, including interference with Goralska (Count 1) and the two counts of simple assault (Counts 2 and 3) went to the jury.

### F.   Jury Instructions.

The court's instructions on the elements of the crime of Interference with Flight Crew Members and Attendants under 49 U.S.C. § 46504 are central to several of the claims in Turner's coram nobis petition.  Those instructions stated:

> The defendant is charged in Count 1 of the indictment with interference with a flight attendant on or about March 14, 2016, in violation of Section 46504 of Title 49 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, that the defendant was on an aircraft in flight in the special aircraft jurisdiction of the United States;
>
> Second, that the defendant intimidated a flight attendant of the aircraft; and
>
> Third, that such intimidation interfered with the performance of the duties of the flight attendant of the aircraft or lessened the ability of the attendant to perform those duties.

14

ECF No. 46, PageID # 144.  The court also provided the following
definition of intimidation:

> A flight attendant may be "intimidated" by the use of
> words or actions that place the flight attendant in
> reasonable apprehension of bodily harm, either to the
> flight attendant or to another, or by the use of words
> or actions that make the flight attendant fearful or
> make that flight attendant refrain from doing
> something that the flight attendant would otherwise
> do, or do something that the flight attendant would
> otherwise not do, or interfere with or lessen the
> flight attendant's ability to do something.
>
> One person in a group can be intimidated by threats
> directed at the group in general. The government does
> not have to prove that the flight attendant was in
> fact frightened for her own physical safety in order
> to prove that the defendant performed the criminal act
> of intimidation.  It is sufficient that the conduct
> and words of the defendant would place an ordinary,
> reasonable person in fear.

*Id.* at 146.  The parties jointly proposed both instructions,
citing an Eleventh Circuit form instruction and Ninth Circuit
case law.  ECF No. 31, PageID # 74, 76.

### G.  Closing Arguments.

In closing, the Government argued that Turner was
guilty of the offense of interfering with a flight attendant
because he "placed [Goralska] in reasonable apprehension of
bodily harm to the victims."  ECF No. 98, PageID # 1028-29.
Specifically, Turner said "'I'm going to break your fucking
neck' to a woman who is maybe five-two."  *Id.* at 1029-30.  The
Government also emphasized that Goralska had heard Turner say
"I'm going to kick [C.M.'s husband's] fucking ass," and that,

15

"Turner was the only person who stood in the aisle and faced the other two passengers." *Id.* at 1030.  In short, Turner's behavior was "volatile, unpredictable, aggressive, and alarming." *Id.* at 1031.  Turner's words and actions were "meant to intimidate the folks around him" because Turner was "trying to get them to behave" and "trying to scare them, make them fearful about what's he's doing, what he wants." *Id.* at 1030.  As to the two assault charges, the Government asserted that Turner assaulted C.M. and R.A. by spitting on C.M. and pushing R.A.'s seat and causing her to be thrust forward into the seat in front of her. *Id.* at 1032.

Turner, on the other hand, argued that Goralska, C.M., and R.A. had all been "tak[ing] queues" from each other to "hide what really happened." *Id.* at 1052.  He contended that, to convict him, the jury had to find him guilty of "spitting, kicking, pushing, [or] intimidating," and that the evidence did not show beyond a reasonable doubt that he had committed any of those acts. *See id.* at 1056.

### H.   Verdict.

The jury found Turner guilty of interference with a flight attendant as charged in Count 1 of the indictment.  ECF No, 51, PageID # 160.  However, the jury found Turner not guilty of having assaulted R.A. and C.M. *Id.*

16

### I.   Post-Trial Conduct.

After the jury found Turner guilty on the interference count, a probation officer contacted Turner to ask him to provide financial information for the presentence report. Turner complied with the request, but he also indicated that he believed that it was not yet necessary for him to prepare for sentencing.  Specifically, he stated that he was "feeling that [he hadn't] been convicted yet as the judge [hadn't] ruled on what the jury pronounced" and that "[t]he evidence was so lacking and contradictory that [he] honestly believe[d] Judge Mollway [would] throw it out."  Def's Ex. 63 at 1.  The probation officer forwarded that email to Turner's attorney, who explained to him that he had, in fact, been found guilty of a felony.  *See id.*

### J.   Sentencing.

Turner's guideline imprisonment range was 4 to 10 months.  ECF No. 58, PageID # 222.  Because the range was in Zone B of the Sentencing Table, however, the minimum guideline term would have also been satisfied by, *inter alia*, "a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment."  *Id.*

At the sentencing hearing, this court noted that it was influenced by a letter from Turner's brother, who explained

17

that both he and Turner had been placed in an orphanage from a young age.  ECF No. 99, PageID # 1102-03.  They "had to deal with people, including older children, who made life very hard for them," which may have "had an impact on [Turner's] ways of reacting to people."  *Id.*  Ultimately, this court concluded that "a prison term would be more than needed to meet the goals of sentencing."  *Id.* at 1106.  This court sentenced Turner to three years of probation, with a probation condition requiring him to be subject to location monitoring for up to six months.  *See id.*  Judgment was entered on June 9, 2017.  ECF No. 61.

### K.   Appeal.

Turner appealed his conviction to the Ninth Circuit. Turner raised four points of error on appeal: (1) the court's instruction defining intimidation misstated the law; (2) the court's instruction on the elements of Count 1 should have indicated that Turner had to "knowingly" interfere with a flight attendant; (3) the court should have given a limiting instruction telling the jury to disregard the testimony about the copilot's actions once the court granted Turner's oral motion for judgment of acquittal as to the portion of Count 1 that related to interference with a copilot, and (4) trial counsel was ineffective because he failed to object to the court's instruction defining "intimidation," an element of the interference charge.  *See United States v. Turner*, 754 F. App'x

664, 664-65 (9th Cir. 2019); *see also* ECF No. 148-8, PageID # 1678.

The Ninth Circuit rejected all four arguments.  It held that (1) because Turner's counsel had agreed to the proposed instruction on intimidation, any error had been invited and could not justify reversal; (2) the omission of the word "knowingly" in the court's instruction did not misstate the law; (3) "due to the strength of the Government's case against him and the district court's careful and otherwise appropriate instruction of the jury, the lack of a limiting instruction was not plain error"; and (4) the record was not sufficiently developed to properly evaluate Turner's claim of ineffective assistance.  *Turner*, 754 F. App'x at 664-65.

In rejecting Turner's second claim, the Ninth Circuit also specifically noted that the evidence against Turner had been overwhelming:

> In any event, any error would be harmless
> beyond a reasonable doubt.  Turner, among
> other things, threatened to "break the neck"
> of other passengers during the altercation.
> The evidence was overwhelming that Turner's
> intentional behavior intimidated the flight
> attendant by causing her to reasonably fear
> for the safety of her passengers and
> herself, thereby diverting her from
> performing other duties aboard the aircraft.

*Id.* at 664-65 (internal citations omitted).  The Ninth Circuit issued its opinion on February 27, 2019 and filed the appellate mandate on April 22, 2019.[8]  ECF Nos. 114, 116.

### L.   Postconviction Motions.

On May 22, 2020, Turner filed a motion to vacate his conviction under 28 U.S.C. § 2255.  ECF No. 117.  In his motion, Turner argued that he was entitled to a new trial because trial counsel had been ineffective.  *See* ECF No. 117-1.  According to Turner, trial counsel should have told him that he probably could have continued to practice medicine if he entered a guilty plea to a misdemeanor.  *See generally id.*  Turner also maintained that trial counsel should have objected to the definition of "intimidation" in the jury instructions.  *See generally id.*  Turner contended that his motion was timely because it was filed less than a year after the deadline for filing a certiorari petition with the Supreme Court had passed. *Id.* at 1228.

_____

[8]  While his appeal was pending, Turner moved to modify his supervised release conditions and also for "bail pending appeal."  This court noted that Turner was not incarcerated, so it made no sense for him to seek "bail."  This court declined to remove the location monitoring condition.  This court also addressed Turner's argument that the portion of his appeal challenging the intimidation instruction was raising a substantial question of law likely to result in reversal or a new trial.  This court disagreed, noting that Turner was overlooking the distinction between how a defendant's action affected a flight attendant's mental state and what the effect on the flight attendant's behavior was.  ECF No. 85.  This issue is discussed in detail later in this order.

Turner, however, had not met one of the other basic prerequisites for filing a § 2255 motion: he was not in custody. *See* ECF No. 138.  Turner had moved for the early termination of his probation while his appeal was still pending, and this court had granted his motion on January 28, 2019.  *Id.* at 1524-25. Because Turner could not be said to be in custody at the time he filed his § 2255 motion, this court dismissed that motion.  *Id.* at 1526-28.

In response to Turner's concerns that "dismissing his § 2255 motion on 'custody' grounds mean[t] that he never had an opportunity to seek relief from this court under that statute because his 'custody' ended while his appeal was pending," this court noted that its ruling did not leave Turner without a remedy:

> Turner himself recognizes that he is not
> without a remedy.  He may bring a coram
> nobis petition, which is designed as a way
> to seek relief long after a sentence has
> been fully served.  In fact, Turner has
> attempted to present a coram nobis petition
> to this court.  This court struck the
> petition because, among other things, it was
> longer than permitted by local court rules
> or any court order.  However, this court has
> invited Turner to file a new coram nobis
> petition complying with court rules.

*Id.* at 1529.

Once this court declined to issue a certificate of appealability with respect to its order dismissing Turner's

§ 2255 motion, Turner sought a certificate of appealability from the Ninth Circuit, which similarly declined his request.  Turner then proceeded with the present coram nobis motion.

Turner largely repeats the assertions raised in his unsuccessful § 2255 motion.  He focuses on two main arguments: (1) trial counsel should have advised him that a misdemeanor conviction would likely allow him to maintain his Texas medical license, and (2) this court's jury instruction defining "intimidation" was erroneous.  With respect to the second contention, Turner provides two alternative theories of ineffective assistance.  He contends that the instruction was incorrect, and his trial counsel was ineffective in agreeing to it.  If, on the other hand, the instruction was correct, he maintains that counsel should have told him, before he rejected the plea deal, that he was almost certain to be convicted.

**M.   Evidentiary Hearing on Coram Nobis Motion.**

**1.    Testimony at the Hearing.**

As discussed in greater detail later in this order, several of Turner's arguments depend on his assertion that, had counsel had not been ineffective, Turner would have accepted the Government's plea offer.  In other words, to prevail on his claim that counsel was ineffective in failing to advise him about the difference between the effect of a misdemeanor conviction and the effect of a felony conviction on his Texas

22

medical license, Turner must show that, had he been properly advised, he would have accepted the plea agreement requiring him to plead guilty to assault, a misdemeanor.  Similarly, to prevail on his claim that, if the intimidation instruction was correct, trial counsel should have told him that he was almost certain to be convicted, Turner must show prejudice by demonstrating that, to avoid certain conviction, he would have accepted the plea agreement.  Because the issue of whether Turner would have accepted the plea agreement implicated Turner's credibility, this court held an evidentiary hearing.  During the hearing conducted on July 30, 2021 and August 11, 2021, the court heard testimony from Dan Lype (Turner's expert on Texas medical licensing issues), Benjamin Ignacio (Turner's trial counsel), and Turner himself.

**Lype**.  Turner called Lype, an expert on Texas administrative law relating to medical licenses, *see* ECF No. 198, PageID # 2151, to establish that, had Turner accepted the plea deal requiring him to plead guilty to assault (a misdemeanor), he likely would have been allowed to keep his Texas medical license.  Turner has not yet gone through any Texas administrative proceeding relating to his felony conviction in the present case, but Lype explained that, in Texas, a felony conviction has a much more serious impact on a doctor's ability to practice medicine than a misdemeanor

conviction.  According to Lype, the board of medicine is required to revoke the license of any physician convicted of a felony.  *Id.* at 2154.  That process begins with a temporary suspension, which occurs almost immediately after the board learns about a felony.  *Id.* at 2157.  The temporary suspension remains in place until the board completes the revocation process.  *See id.*  Once the board issues a final revocation order, a physician must wait for a year before filing a petition for reinstatement.  *Id.* at 2158.

Lype acknowledged that the board has the discretion to "probate" a revocation order, thereby permitting a doctor to continue to practice.  *Id.* at 2178-80.  The board's exercise of its discretion, however, is both inconsistent and heavily dependent on the board members assigned to the case.  *Id.*  In general, a decision to probate a revocation is "extremely rare." *Id.* at 2201.  Lype said he had been able to obtain probated revocations only in cases involving physicians caught using drugs.  Lype opined that in such cases the board was "more understanding because they view that as more of . . . a disease . . . [or] a chemical dependency process that can be treated . . . and monitored through drug testing."  *Id.*

In contrast, revocation of a medical license is not mandatory when a physician has a misdemeanor conviction.  In such cases, the board retains discretion, and the board usually

24

does not choose to revoke the license of a physician found guilty of a misdemeanor. *Id.* at 2174. Lype believed that, if Turner had been convicted of a misdemeanor, it would have been extremely unlikely that he would lose his license. *Id.*

On cross-examination, however, Lype acknowledged that there were some similarities between how the board handled felony convictions and misdemeanor convictions. In the felony context, the board has the discretion to probate any revocation, and in the misdemeanor context, the board retains the discretion to revoke a physician's license. In either case, the board would "consider[] the underlying facts as detailed by court and investigative documents and potentially an interview or discussion with the defendant." *Id.* at 2186.

Of course, the board can only act once it finds out about a conviction. In Texas, doctors do not have to report criminal convictions immediately. Instead, doctors must notify the board when they renew their licenses. *See* ECF No. 198, PageID # 2154-56. If a doctor, for whatever reason, does not file an application for renewal, the license is cancelled after a year. *Id.* at 2163. In this case, Turner decided not to renew his Texas license, possibly worried that it would be revoked if he reported his felony conviction. *See id.* at 2164-65. His license was therefore automatically cancelled on June 1, 2020. *Id.* at 2165.

Turner has recently applied for relicensure.  If a physician with a felony conviction applies for relicensure, the medical board is not required to automatically suspend his license if it approves his application.  Thus, by choosing to let his license lapse and then applying for relicensure, Turner has avoided the mandatory revocation flowing from a felony conviction.[9]

However, a felony conviction has consequences even in the relicensure process.  A physician with a felony conviction is often asked to appear before the licensure committee, and the board members usually meet with the physician to discuss the conviction.  *Id.* at 2169.  In some cases, the board denies relicensure applications from physicians who have been convicted of felonies.  *Id.* at 2169-70.  A misdemeanor conviction can also present an obstacle, but Lype opined that a physician with a misdemeanor conviction is much less likely to have to meet with the committee or to have his relicensure application denied.  *Id.* at 2171-72.  Again, however, Lype acknowledged that, whether with a felony or a misdemeanor, the board would consider the

---

[9]  This court does not have a sufficient record to determine whether Turner was deliberately attempting to avoid mandatory reporting in Texas while waiting out the period for his Texas license to lapse.  He may have been doing that, or he may have at the time just assumed that he could never practice in Texas again.  In any event, following his conviction in the present case, Turner obtained a license in New York, where he has been practicing for what he testified was substantially lower compensation.

facts underlying a conviction before reaching a decision.  *Id.* at 2188.

Ignacio.  Turner also elicited testimony from his trial attorney, Benjamin Ignacio.  Ignacio's testimony focused on Turner's rationale for rejecting the plea deal offered by the Government.  As a general matter, Ignacio indicated that Turner was driven by two considerations.  First, Turner wanted to do everything he could to avoid losing his Texas medical license.  Second, Turner felt that the charges against him were unfair, and he wanted his day in court to clear his name.  ECF No. 198, PageID # 2257.

Ignacio acknowledged that Turner told him that his medical license was "very important to him," and that they discussed that topic frequently.  *Id.* at 2129.  According to Ignacio, he did not personally provide Turner with legal advice about the impact of a conviction on his ability to practice medicine in Texas.  *See, e.g.*, *id.* at 2131-33.  Instead, he says that he told Turner that it was Turner's responsibility to investigate that topic.  *Id.*  Ignacio says he suggested Turner contact a licensing attorney in Texas, the Texas medical board, or Texas's version of Hawaii's regulated industries board.  *Id.* at 2133.  Ignacio assumed that Turner had in fact conducted his own inquires, and Ignacio therefore accepted Turner's representations that even a misdemeanor conviction would

intolerably jeopardize his Texas medical license.  *Id.* at 2137-39.

Ignacio also emphasized that Turner was motivated by the certainty that he had done no wrong.  *Id.* at 2240 ("It was clear he didn't think he did anything wrong."); *see also id.* at 2256.  When confronted with evidence of wrongdoing, Turner seemed to Ignacio to minimize it or reject it.  For instance, Turner "insisted" on telling Ignacio that the incident aboard the American Airlines flight "wasn't that bad and his behavior wasn't that bad."  *Id.* at 2116.  Similarly, when confronted with adverse testimony in the law enforcement reports, Turner "dismissed" and "reject[ed]" that testimony.  *Id.* at 2122.  Indeed, Ignacio recalled that Turner indicated that *all* of the other witnesses were either "lying or exaggerating."  *Id.* at 2228; *see also id.* at 2256-57.

According to Ignacio, Turner therefore believed that the Government had wronged him by bringing charges against him, causing him to want to go to trial to "tell [his] story."  *Id.* at 2228; *see also id.* at 2240.  In other words, Turner "wanted his day in court."  *Id.* at 2137-38.

For these reasons, Ignacio did not think it likely that Turner would have accepted the Government's plea deal even had Turner known about the different possible effects of misdemeanor and felony convictions.  Ignacio noted that, at a

change of plea hearing, Turner would have had to participate in an extensive colloquy involving a recitation of the facts and a demonstration of acceptance of responsibility.  Ignacio said he "did not think [that] would be easy" for Turner.  *Id.* at 2262. Ignacio did, however, acknowledge that he could have explored an alternative plea deal in which the Government introduced new assault charges based on acts that Turner could have agreed he had committed.  *Id.* at 2283.

Ignacio also addressed his pretrial investigation. Ignacio testified that, after he reviewed the FBI reports, he contacted private investigators to discuss whether it would be possible to locate other passengers who had witnessed the incident.  The investigators told him that "it would involve travel or at least long distance work."  *Id.* at 2222.  He told Turner that pursuing that inquiry would "be an additional expense," and he was left with the "sense [that] he didn't want to spend the money on it."  *Id.* at 2223.

That decision did not concern Ignacio, because he "wasn't optimistic about finding witnesses who would corroborate Dr. Turner's version [of events]."  *Id.* at 2224.  The FBI had interviewed a number of witnesses, who all generally told the same story, which was unhelpful to Turner.  *Id.* at 2225. Ignacio therefore engaged in an "ongoing conversation" with Turner about the "inculpatory nature of the evidence."  *Id.* at

29

2240; *see also id.* at 2128.  Despite Ignacio's warnings, Turner insisted on going to trial, which was a "personal decision going against [Ignacio's] advice."  *Id.* at 2128.

Finally, Ignacio briefly discussed his decision to agree to the Government's jury instruction on the intimidation element of the interference charge.  He explained that, after receiving the proposed instruction from the Government, he thought he would have compared the Government's proposal to the Eleventh Circuit pattern instruction, which the Government cited.  *Id.* at 2099.  He also said he would have checked to confirm that there was not a pattern Ninth Circuit instruction on the same issue.  He said that he did not conduct further research.  *Id.*

In his direct criminal appeal, Turner had maintained that Ignacio provided ineffective assistance in agreeing to the proposed instructions on intimidation.  At oral argument before the Ninth Circuit, the Government responded by asserting that the record was not sufficiently developed to allow the court to rule on that argument and that Ignacio may have had a strategic reason for agreeing to the instruction.  ECF No. 148-9, PageID # 1753.  During the coram nobis hearing, Ignacio said he had no such strategic reason.  ECF No. 198, PageID # 2108.  Other than that testimony, the record before this court is no better than the record that was before the Ninth Circuit when it declined to

30

rule on the legal issue of whether Ignacio was ineffective in agreeing to the intimidation instruction. *See Turner*, 754 F. App'x at 665 ("We decline to reach Turner's ineffective assistance claim because the record is not sufficiently developed to properly evaluate the issue.").

**Turner**.  Turner's own testimony was consistent with Ignacio's in some respects, but there were also areas of clear disagreement.  Turner, like Ignacio, indicated that, in considering the plea deal the Government offered him, he had two primary concerns.  He wanted to avoid prison time, as "nobody wants to go to jail."  ECF No. 204, PageID # 2374.  His other concern was the impact that a conviction would have on his ability to practice medicine in Texas.  *Id.*  Based on those considerations, Turner testified that, if only he had known about three specific matters, he would have accepted the plea deal offered by the Government and would have been willing to plead guilty to a misdemeanor assault charge.

First, Turner stated that he would have entered a misdemeanor guilty plea if he had known that, as Dan Lype testified, a misdemeanor was unlikely to have a significant impact on his Texas medical license.[10]  According to Turner, he had believed that, whether convicted of a misdemeanor or a

_____

[10] It appears that Turner believed that with a guilty plea he would avoid incarceration.  *See* Def's Ex. 24 at 1 ("Under this deal, you would avoid incarceration.").

31

felony, he "wouldn't be able to practice medicine . . . for a period of time, and that's not good." *Id.* at 2376-77.  Turner also said he had thought that at trial he had a good chance of prevailing on the felony charge of interfering with a flight attendant, and that he was somewhat more likely to be convicted of the assault charges.  *Id.* at 2405; *see also id.* at 2362.  Turner said that that he would have "accepted the Government's plea" if he had had "the information that Mr. Lype testified to."  *Id.* at 2381-82.

In this regard, Turner indicated that Ignacio misled him by suggesting that accepting the plea deal would probably prevent him from practicing medicine.  According to Turner, when he told Ignacio that either a felony or a misdemeanor conviction would prevent him from practicing medicine, Ignacio "said, well, okay, I'll check."  *Id.* at 2377-78.  Turner did not explicitly follow up on that issue with Ignacio.  *Id.* at 2379.  However, Turner "took him for his word," and "assumed he checked."  *Id.* Contradicting Ignacio, Turner stated that Ignacio never told him to contact a licensing attorney in Texas, the Texas medical board, or Texas's version of Hawaii's regulated industries board.  *Id.* at 2379-80.

Second, Turner stated that he would have accepted the Government's plea deal if he had known the language of the jury instruction defining "intimidation."  *Id.* at 2362, 2383.

32

Examining the jury instruction, Turner said that the language made him almost certain to be convicted, because he knew that he had caused Goralska to do something that she would not otherwise have done.  *Id.* at 2352-53.  He testified in the coram nobis evidentiary hearing that he would have accepted the Government's plea deal if he had known how the jury instructions defined "intimidation," given his "big fear" of going to prison.  *Id.* at 2383.

Third, Turner stated that Ignacio did not conduct an adequate pretrial investigation.  According to Turner, Ignacio never asked him to pay for a private investigator.  Turner said that, if Ignacio had asked, Turner would have made the necessary payments.  ECF No. 204, PageID # 2392-93.  Turner also stated that Ignacio never showed him the statements given to the FBI by two passengers seated across the aisle from him on the plane.  *Id.* at 2393-94.  The two passengers were not witnesses at trial, but, in their statements to the FBI, echoed trial witnesses in saying that Turner initiated the confrontation with C.M. and R.A. and acted aggressively and violently throughout the incident.  Def's Ex. 75 at 1-4.  One of the passengers stated that she was "very scared of Turner and his ongoing violent outbursts," and that she was afraid that Turner was going to "pull out a gun and start shooting people."  *Id.*  Turner testified during the coram nobis hearing that if he had known

33

about those statements, he would have accepted the plea deal because the reports "[did]n't sound good."  ECF No. 204, PageID # 2394.

### 2.  Credibility.

To the extent Turner and Ignacio provided conflicting testimony at the hearing, this court must determine which witness was credible.  In that regard, the court makes the following findings.

**Ignacio's Credibility.**  This court finds Ignacio's testimony to be credible.  That conclusion is based on several considerations, including Ignacio's demeanor at the hearing, his statements, and his honesty when confronted with difficult questions.  Throughout the hearing, Ignacio appeared confident, calm, and thoughtful, although he did become emphatic when defending his own presentation of Turner's case at trial. He was candid when he did not remember important details or when his own testimony painted him in a bad light.  For instance, he frankly admitted that he "evaded" Turner's present counsel and refused to provide him with Turner's file promptly because he was embarrassed that the file was in such poor condition.  ECF No. 198, PageID # 152.  This court credits Ignacio's testimony.

**Turner's Credibility.**  In contrast, this court finds that, on several crucial issues, Turner lacks credibility.  This court is not saying that Turner deliberately said things he knew

to be untrue.  Rather, Turner, who openly admitted that he was desperate to have the felony conviction wiped from his record, *see, e.g.*, ECF No. 204, PageID # 2490, appeared to be influenced by having heard from his attorney what he needed to prove to prevail.  Consciously or unconsciously, Turner seemed to the court to shape his testimony to meet the governing legal standard.  This court bases this conclusion on several considerations.

First, as background, this judge was present at Turner's trial and observed everything that the jury saw.  In particular, this court noticed that Turner was engaged and attentive.  From time to time, Turner initiated discussions with his attorney.  This occurred most often when other witnesses were testifying.  The reason the trial judge recalls this is that Turner was sometimes unusually agitated, hastily and forcefully moving close to his attorney to begin whispered conversations.  Turner, in short, appeared very involved in his own defense.  This undermines statements he made about having been unaware of certain matters that occurred during trial, particularly with respect to a conference on jury instructions.[11]

---

[11] In a motion to strike and bar consideration of certain matters, Turner has argued that, even though this judge is the finder of fact on the present coram nobis motion, this judge cannot consider her own observations at trial in resolving his coram nobis.  This court disagrees.  None of the cases cited by Turner involved a court considering what was observed at trial in

Second, on several issues, Turner made statements that he apparently believed were helpful to his legal arguments, but that were plainly contradicted by the record.  For instance:

- At the evidentiary hearing, Turner stated that when he heard the jury instruction defining "intimidation," he "couldn't believe what [he] was hearing."  As the instructions were read to the jury, he "thought [he] was basically going to be convicted" because, given the testimony at trial, he

deciding a postconviction motion.  *See, e.g.*, *United States v. Blanchard*, 542 F.3d 1133, 1146-52 (7th Cir. 2008) (holding that the trial court erred by placing statements made by the judge at a suppression hearing before the jury as "judicial testimony"); *United States v. Nickl*, 427 F.3d 1286, 1292-93 (10th Cir. 2005) (holding that the trial court erred by providing jurors with factual information about a plea hearing); *United States v. Lewis*, 833 F.2d 1380, 1385 (9th Cir. 1985) (holding that the trial court erred in considering the judge's own observations about the effects of an anesthetic in deciding a suppression motion).  This court is not required to ignore its own observations of Turner in the very matter that is at issue in Turner's coram nobis motion.

In *Murray v. Schriro*, 882 F.3d 778, 819-22 (9th Cir. 2018), a habeas case challenging an Arizona murder and robbery conviction, the Ninth Circuit found no impropriety in having a state trial judge preside over a postconviction proceeding after the judge had noted his own recollection about defense counsel's behavior, a matter in issue during the postconviction proceeding.  The Ninth Circuit recognized that a trial judge's "unique knowledge of the trial court proceedings renders him 'ideally situated' to review the trial court proceedings."  *Id.* at 821 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 476 (2007)).  As is the case here, that judge's "'knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings.'"  *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)).  The motion to strike and bar consideration is denied.  But, even if the court does not consider its own observations at trial, this court would still find that Turner lacked credibility during the coram nobis evidentiary hearing.

was "basically guilty." ECF No. 204, PageID # 2351-54. However, shortly after he was convicted, he told a probation officer that he believed he had not "been convicted yet" because the "evidence was just so lacking and contradictory that [he] honestly believe[d] that" this judge would "throw it out." Def's Ex. 63, at 1. While Turner did, at some point, come to have concerns about the intimidation instruction, *see* ECF No. 64, it does not appear that he believed that he was certain to be convicted *before* the jury issued its verdict.

- At the hearing, Turner stated that he did not have Ignacio's "advice on whether to testify" at trial. ECF No. 204, PageID # 2474-75. However, at trial, he explicitly stated that he "ha[d] a chance to discuss with [his] lawyer [his] right to be silent and [his] right to testify," and that he "voluntarily, *with the advice of [his] lawyer*" decided to testify. ECF No. 97, PageID # 940-41.

- At the hearing, Turner stated that was not given the option of participating in an off-the-record conference settling jury instructions. ECF No. 204, PageID # 2502. At trial, however, Ignacio waived Turner's presence at that conference *while Turner was standing next to him*. *See* ECF No. 95, PageID # 660-62; *see also* ECF No. 97, PageID # 993-95. Hearing Ignacio waive his presence, Turner was clearly on notice of a jury instruction conference that he could have attended.

Turner contests the final point. He insists that there is no contradiction between his testimony at the coram nobis evidentiary hearing and the trial record. *See generally* ECF No. 212. This court disagrees. At the hearing, Turner testified unequivocally that he was not present for the off-the-record conference because "Ben just told me it was time to go to lunch," and that he "didn't know he was invited" to the conference. ECF No. 204, PageID # 2502. In fact, the record

indicates that the reason Turner was not present has nothing to do with lunch and instead resulted from the express waiver of his presence.

Moreover, the trial transcript clearly shows that this court discussed whether Turner would exercise his right to attend the conference while Turner himself was present. ECF No. 95, PageID # 660-62. It would have been consistent with Turner's attentiveness during trial for him to speak up had he wanted to attend a conference his attorney was waiving his presence at. The transcript indicates no interval between the judge's inquiring about whether Turner wanted to be present and Ignacio's statement that "[w]e will waive his presence. *Id.*, PageID # 661. Because this court had also indicated that "you can tell me tomorrow," Ignacio's ready response suggests that he did not need the evening to discuss the matter with Turner, presumably having already discussed it after the court's earlier statements about its procedures. Here, Turner very much appears to have shaped his testimony to support his legal arguments.[12]

_____

[12] Turner's counsel maintains that there is a contradiction between two different instances in which this court explained its procedures for settling jury instructions. *See* ECF No. 212, PageID # 2602-03. Turner's counsel is mistaken. At a pretrial conference that Turner did not attend, this court explained that it would hold an off-the-record conference if there were going to be extensive disputes about the instructions. ECF No. 92, PageID # 450. This court also asked at that pretrial conference, "Does the defendant wish to be present for the settling of jury instructions? Because if the defendant does

Third, this court considers Turner's demeanor during the evidentiary hearing.  During his testimony, Turner appeared evasive and agitated; he frequently interrupted himself, stopping and restarting sentences.  Possibly, this is Turner's typical manner of speaking, but it also appeared that he was so anxious to correct what he viewed as an injustice he had suffered that his anxiety interfered with the accuracy of his testimony.  In short, this court was left with the distinct impression that Turner was saying what he thought he had to say to obtain coram nobis relief, not actually recalling events clearly.

**Specific Credibility Findings.**  This court finds that Turner lacked credibility in four specific areas.  First, this court does not believe Turner's statement that he would have accepted the plea deal if, ahead of trial, he had read the FBI's summaries of the statements made by two passengers sitting across from him.  Turner says Ignacio failed to show him those

---

want to do that, it can still happen on the same schedule, but then I won't do it off the record."  *Id.* at 451.  During the coram nobis evidentiary hearing, this judge referred to her practice of holding off-the-record jury instruction conferences unless the defendant wished to be present.  ECF No. 204, PageID # 2508.  There is no contradiction.  At the pretrial conference, this court was simply describing two *different* considerations that affected whether it conducted discussion on or off the record.  One or both could be in issue.  Although it remarked on both considerations during the pretrial conference, this court referred to only the one relevant consideration during the coram nobis hearing.  That creates no inconsistency.

summaries.  But it is only recently that Turner has expressed
concern about those passengers' statements that he had been
unnecessarily violent and aggressive.  That is, in saying that
he would have accepted the proposed plea deal involving a
misdemeanor had Ignacio shown him the summaries, Turner is
articulating a relatively new position.  ECF No. 204, PageID #
2394.  Earlier, his attorneys had suggested that those
passengers might have provided testimony helpful to Turner, and
that trial counsel had been ineffective in failing to track them
down to interview them.  ECF No. 177, PageID # 1920.

　　　　As it turns out, those passengers declined to speak
with Turner's present counsel upon being contacted by the
Government pursuant to this court's order in connection with the
coram nobis motion.  ECF No. 180.  It is not clear that Ignacio
would have fared better before trial.  This court understands
that Turner's present counsel had to make the best of the
situation when stymied in his attempt to contact those
passengers.  But, in moving from arguing that Ignacio was
ineffective in having failed to interview them to contending
that those passengers' statements would have caused Turner to
plead guilty, Turner is creating more than a disconcerting shift
in approach.  The positions are wildly inconsistent.

　　　　Nor can Turner's testimony be reconciled with his
adamant refusal to give credit to any testimony that painted him

in a negative light.  When the FBI case agent believed other witnesses' versions of events, Turner filed a complaint with the FBI.  When Ignacio discussed the inculpatory nature of other witnesses' testimony, Turner insisted that his own version of events was correct.  Even after the jury found him guilty, Turner *still* refused to accept the weight of the testimony against him.

Knowing that several trial witnesses were going to say that he had acted aggressively, Turner rejected or minimized their testimony.  His present contention that he would have changed his mind if he had known about two witnesses who disagreed with him is wholly incredible.  It is an excellent example of how, consciously or unconsciously, Turner tailored his testimony at the evidentiary hearing to support the legal arguments his attorneys ultimately decided to make on his behalf.

Second, this court questions Turner's claims that Ignacio volunteered to check on the effect that a misdemeanor conviction would have on Turner's ability to practice medicine. Turner's demeanor during the evidentiary hearing causes the court to doubt Turner's recollections in this regard, as Turner consistently appeared to have been influenced by his understanding of what he needed to prove to establish that Ignacio was ineffective.

Finally, Turner testified that he would have accepted the proposed plea deal if he had known two specific facts: (1) that a misdemeanor conviction was much less likely to have a serious impact on his ability to practice medicine in Texas, and (2) that the court would give the agreed-upon definition of "intimidation."  This court finds that both statements lack credibility.  Because those findings go to the heart of this motion, they are addressed in much greater detail below, after a discussion of the pertinent legal context.

**III.   ANALYSIS.**

> **A.   A Writ of Coram Nobis Seeks Extraordinary Relief.**

The 1946 amendments to Rule 60(b) of the Federal Rules of Civil Procedure abolished several common law writs, including the writ of coram nobis. *See Doe v. I.N.S.*, 120 F.3d 200, 202 (9th Cir. 1997).  In *United States v. Morgan*, 346 U.S. 502, 511 (1954), the Supreme Court held that, despite that abolition, district courts still retained limited authority to issue common law writs, including writs of coram nobis in collateral criminal proceedings.  *See also* 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").

The common law writs survive "only to the extent that they fill 'gaps' in the current systems of postconviction relief." *United States v. Valdez-Pacheco*, 237 F.3d 1077, 1079 (9th Cir. 2001). "[T]he writ of coram nobis is a highly unusual remedy, available only to correct grave injustices in a narrow range of cases where no more conventional remedy is applicable." *United States v. Riedl*, 496 F.3d 1003, 1005 (9th Cir. 2007). The writ is "extraordinary, used only to review errors of the most fundamental character." *Id.* (quotation marks and citations omitted); *see also Carlisle v. United States*, 517 U.S. 416, 429 (1996) ("[I]t is difficult to conceive of a situation in a federal criminal case today where a writ of coram nobis would be necessary or appropriate." (quotation marks, brackets, and citation omitted)). Errors are of the most fundamental character when they render a proceeding invalid. *See Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987).

Unlike claims under 28 U.S.C. § 2255, which applies only when convicted defendants are in "custody," the writ of coram nobis allows a defendant to attack a conviction when the defendant has completed a sentence and is no longer in custody. *See Matus-Leva v. United States*, 287 F.3d 758, 761 (9th Cir. 2002) (holding that a prisoner who is in custody may seek relief under § 2255, not under the writ of coram nobis)*; Estate of McKinney v. United States*, 71 F.3d 779, 781 (9th Cir. 1995). It

43

"provides a remedy for those suffering from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact and egregious legal errors." *McKinney*, 71 F.3d at 781.

To qualify for coram nobis relief, a petitioner must establish all of the following:

> (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.

*Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987); *accord Matus-Leva*, 287 F.3d at 760 (same); *McKinney*, 71 F.3d at 781-82 (same). "Because these requirements are conjunctive, failure to meet any one of them is fatal." *Matus-Leva*, 287 F.3d at 760.

The Government concedes that Turner has satisfied the first (unavailability of a more usual remedy) and third (existing adverse consequences) prongs, although it notes that Turner has not made a strong showing of adverse consequences. ECF No. 176, PageID # 1878. The Government contends that Turner has failed to satisfy the second (reason for not attacking the conviction earlier) and fourth (error of the most fundamental character) requirements. *Id.*

### B.   Turner has At Least One Valid Reason for Not Having Attacked His Conviction Earlier.

Under the second requirement, Turner must justify his failure to pursue the arguments in his coram nobis petition earlier.  "[W]hether a petitioner can *reasonably* raise a claim is determinative of whether delay is justified." *United States v. Kroytor*, 977 F.3d 957, 961 (9th Cir. 2020) (emphasis in original).  "That is, where petitioners reasonably could have asserted the basis for their coram nobis petition earlier, they have no valid justification for delaying pursuit of that claim." *Id.*  "If, however, petitioners did not have a reasonable chance to pursue their claim earlier due to the specific circumstances they faced, delay during the time when such circumstances existed may be justified." *Id.*  Thus, Turner must demonstrate that he could not have reasonably advanced his detailed ineffective assistance claim in prior proceedings, such as on direct appeal or as a part of an earlier postconviction petition. *See United States v. Riedl*, 496 F.3d 1003, 1006 (9th Cir. 2007) (holding that the petitioner could not satisfy the second requirement because she conceded she could have asserted her claims on direct appeal or in a 28 U.S.C. § 2255 motion).

### 1.   Turner Could not have Raised His Claims on Direct Appeal.

Turner first maintains that his ineffective assistance of counsel claims do not "appear on the record and could not

[have been] raised on direct appeal." ECF No. 182, PageID # 1941. This court agrees. Turner's claim that trial counsel failed to advise him that a felony conviction could cause him to lose his medical license would not have been evident from the appellate record. *See United States v. Ross*, 206 F.3d 896, 900 (9th Cir. 2000) ("We review ineffective assistance claims on direct appeal under two circumstances: (1) when the record on appeal is sufficiently developed to permit review and determination of the issue, or (2) when the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel." (internal quotation marks omitted)).

Moreover, Turner did argue on appeal that trial counsel had provided ineffective assistance by failing to object to the jury instruction defining intimidation. The Ninth Circuit held that "the record is not sufficiently developed to properly evaluate the issue." *Turner*, 754 F. App'x at 665. Turner could not have raised his ineffective assistance of counsel claims on direct appeal.[13]

---

[13] The Government does not argue otherwise. *See* ECF No. 167, PageID # 1880-82. This court notes that, with respect to the foundational legal issue of whether the instruction was erroneous, the record before this court is the same as the record before the Ninth Circuit. The Ninth Circuit held that, if the instruction was erroneous, any error would have been invited by Turner. With respect to the alleged ineffective assistance of counsel in proposing the instruction, the Ninth

46

2.   **Turner has Valid Reasons for Not Filing an Earlier Postconviction Petition.**

Turner must also justify his failure to advance his claims of ineffective assistance in an earlier postconviction petition.  This court entered judgment against Turner on June 9, 2017, *see* ECF No. 61, and the Ninth Circuit issued its opinion affirming that judgment on February 27, 2019.  ECF No. 114. Turner nevertheless waited more than a year before filing his motion to vacate his conviction under 28 U.S.C. § 2255 on May 22, 2020.  ECF No. 117.  It was only after the Government moved to dismiss that motion on the ground that Turner was no longer in custody that Turner filed his first coram nobis petition on June 24, 2020.  ECF Nos. 125, 129.  After the court struck that petition for, among other things, the failure to comply with this court's local rules, Turner filed the present motion on August 12, 2020.  In light of that history, Turner must, at the very least, explain why he did not challenge his conviction before May 22, 2020.

As an initial matter, "a petitioner is not barred from seeking coram nobis relief simply because he could have sought relief while in custody but failed to do so."  *United States v. Kwan*, 407 F.3d 1005, 1012 (9th Cir. 2005), *abrogated on other*

_____

Circuit had before it the Government's suggestion that Ignacio had a strategic reason for agreeing to the instruction, a position that Ignacio rejected at the coram nobis evidentiary hearing.

*grounds by Padilla v. Kentucky*, 559 U.S. 356 (2010).  Thus, even if Turner could have filed a § 2255 motion before this court terminated his period of probation, that fact is not dispositive.  *Id.* (rejecting the Government's argument that the petitioner was not eligible for coram nobis relief because he "could have filed a § 2255 motion while he was still in custody but failed to do so").  Turner must be "given the opportunity to explain why he did not seek relief while in custody, and he is only barred from coram nobis eligibility if he fails to show that he had valid reasons for delaying."  *Id.*

Turner offers two reasons for his delay.  First, he appears to maintain that he could not have raised his claims earlier because trial counsel delayed providing the case file for a prolonged period.  *See* ECF No. 182, PageID # 1941; ECF No. 147, PageID # 1582-83.  The court finds that assertion unpersuasive.  None of the ineffective assistance of counsel claims that Turner has raised depends on the information contained in his client file.  The bases of those claims were not hidden.  Turner did not need his file to know that trial counsel had not advised him that a felony conviction would cause him to lose his medical license.  Nor did he need his file to know that trial counsel failed to object to a purportedly erroneous jury instruction.  In fact, the jury instruction in issue was included in a set of jointly proposed instructions

48

that appeared in the court's electronic case file, readily available to the public and to Turner's sentencing counsel.  It was addressed in Turner's motion for bail pending appeal and in his appellate briefs.  Because that jury instruction purportedly made it easier for the jury to convict Turner, trial counsel had no tactical reason for having agreed to it.  The file created by Turner's trial counsel would not have assisted him in identifying these claims or prevented him from advancing them.[14]

In fact, Turner raised the same arguments in his § 2255 motion, which he filed *before* receiving his file from trial counsel.  *See generally* ECF No. 117-1.  Trial counsel's refusal to promptly provide Turner with his file therefore cannot justify Turner's failure to file a postconviction motion more quickly.

Turner's second argument is more compelling.  Turner essentially argues that he did not file a postconviction motion earlier because his attorney provided him with bad advice.  This bad advice came not from trial counsel, but from counsel representing Turner on the present coram nobis motion.  Specifically, Turner argues that he "filed a habeas petition

---

[14] The one possible exception is Turner's claim that counsel failed to conduct an adequate investigation.  As discussed in detail below, however, to prevail on that claim Turner must identify some evidence that trial counsel should have discovered but did not.  By definition, such evidence would not be located in counsel's file.

within the timeframe provided by [AEDPA]" *see* ECF No. 182, PageID # 1940, and that his failure to file an earlier habeas petition was the "result of the advice provided to [Turner] by appellate counsel." *See id.* at 1942 n.5.  That attorney says that he "calendared the due date for the Section 2255 Petition one year and ninety days after the denial of Dr. Turner's direct appeal," and that he "advised him of the deadline."  ECF No. 182-1, PageID # 1957.  "[B]ut for [that] incorrect advice, a Section 2255 Petition would have been filed by Dr. Turner prior to the termination of his probation."  *Id.* at 1958.  In short, Turner's attorney told him that he could pursue his ineffective assistance claims by filing a § 2255 motion on May 22, 2020.  Of course, that advice turned out to be wrong, because, by that point, Turner was no longer in custody and so was ineligible for § 2255 relief.

The Ninth Circuit has held that "a delay was justified where . . . a petitioner delayed taking action due to misadvice from his attorney that he had no reason to know was erroneous." *Kroytor*, 977 F.3d at 962.[15]  For instance, a coram nobis petition

---

[15]   In *Kroytor*, the Ninth Circuit did hold that "a lack of clarity in the law is not itself a valid reason to delay filing a coram nobis petition," even though the court appeared to recognize that the delay was the fault of the defendant's attorney.  *Id.* at 962; *see also id.* at 963 (noting that the defendant's "post-conviction attorney did not act with the necessary expediency").  Turner's case does not involve a lack

is timely when "the petitioner was improperly advised by counsel not to pursue habeas relief." *Riedl*, 496 F.3d at 1007; *accord Kwan*, 407 F.3d at 1013-14 (holding that a delay was justified when postconviction counsel advised the petitioner not to file a habeas petition).  That rule applies here.  Turner's attorney advised him not to pursue habeas relief earlier because the attorney believed that a petition filed by May 22, 2020, would be timely.  Turner's delay was caused by "misadvice from his attorney that he had no reason to know was erroneous."  His failure to file an earlier coram nobis petition is therefore justified for the purposes of the present order's analysis of the second coram nobis factor.  *Kroytor*, 977 F.3d at 962.

### C.   Turner has not Shown that His Conviction was the Result of Errors of the Most Fundamental Character.

Turner, however, does not satisfy the fourth coram nobis requirement.  He has failed to show that his conviction was caused by any error of the most fundamental character.

Turner asserts that trial counsel's ineffective assistance constitutes such an error.  The Ninth Circuit has held that Turner "may satisfy the fundamental error requirement by establishing that he received ineffective assistance of counsel."  *Kwan*, 407 F.3d at 1014.  To do so, Turner must

---

of clarity in the law.  Rather, Turner asserts that his attorney affirmatively misled him.

satisfy the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). He "must prove 1) that his counsel's performance fell below an objective standard of reasonableness, and 2) that the deficiency in his counsel's performance prejudiced him." *Kwan*, 407 F.3d at 1014.

Turner raises four separate ineffective assistance of counsel claims. First, he contends that trial counsel performed deficiently during the plea-bargaining process because trial counsel did not tell him that a felony conviction would pose a greater threat to his medical license than a misdemeanor conviction. ECF No. 147, PageID # 1586-91. Second, Turner raises several claims of ineffective assistance that relate to the court's jury instruction defining the element of intimidation. *Id.* at 1593, 1596-1604. Third, Turner maintains that trial counsel failed to conduct a reasonable investigation before advising Turner about the consequences of rejecting the government's proposed plea. *Id.* at 1592-94. Fourth, Turner claims that trial counsel was ineffective because he failed to ask this court to issue a curative instruction telling the jury not to consider the evidence that the Government had introduced about the effect of Turner's actions on the copilot. *Id.* at 1604-05. Those claims all lack merit.

        **1.**    **The Sixth Amendment does not Require an Attorney to Advise a Defendant that a Conviction may Affect a Professional License.**

Turner first claims that trial counsel failed to advise him about the consequences of a felony conviction on his Texas medical license.  Turner says he would have entered a guilty plea to a misdemeanor had he understood the impact of a felony conviction.  *See* ECF No. 147, PageID # 1586-90. According to Turner, before he decided to reject the misdemeanor plea deal offered by the Government, he should have been advised that a felony conviction would increase the likelihood that he would lose his license.[16]  ECF No. 147, PageID # 1588-90.  But any impact on Turner's medical license was a collateral consequence of his conviction, and trial counsel had no duty to advise Turner about that kind of possible consequence.  *See United States v. Fry*, 322 F.3d 1198, 1200 (9th Cir. 2003), *abrogated in part by Padilla v. Kentucky*, 559 U.S. 356 (2010).

In *Fry*, the Ninth Circuit held that "counsel's failure to advise a defendant of collateral immigration consequences of the criminal process does not violate the Sixth Amendment right to effective assistance of counsel."  322 F.3d at 1200.  That conclusion rested on the well-established rule that "counsel's

---

[16]  Some of Turner's testimony suggested that Ignacio affirmatively misled him about the impact a conviction could have on his medical license.  As discussed above, that testimony is not credible.

failure to advise a defendant of a collateral penalty is not objectively unreasonable and therefore does not amount to ineffective assistance."  *Id.*; *see also Torrey v. Estelle*, 842 F.2d 234, 237 (9th Cir. 1988) ("Failure to advise [a defendant] of a collateral penalty cannot be held to be below an objective standard of reasonableness.").  Because "deportation is a collateral, not direct, consequence of the criminal process," the Ninth Circuit held that attorneys did not have to provide advice on that issue.  *Fry*, 322 F.3d at 1200.

After the Ninth Circuit decided *Fry*, the Supreme Court considered whether an attorney had "an obligation to advise [a defendant] that the offense to which he was pleading guilty would result in his removal from this country."  *Padilla*, 559 U.S. at 360.  The Supreme Court began by recognizing that several courts of appeal and many state supreme courts had held that "collateral consequences are outside the scope of representation required by the Sixth Amendment."  *Id.* at 365 & n.9 (internal quotation marks omitted).  Although the Supreme Court had "never applied [that] distinction" itself, it did not consider the validity of the rule further.  *Id.* ("Whether that distinction is appropriate is a question we need not consider in this case[.]").  Thus, the Supreme Court left *Fry*'s distinction between direct and collateral consequences intact.  *Chaidez v. United States*, 568 U.S. 342, 355 (2013) ("Even in *Padilla* we did

54

not eschew the direct-collateral divide across the board."); *see also, e.g.*, *United States v. Reeves*, 695 F.3d 637, 640 (7th Cir. 2012) ("Although the Supreme Court declined to apply this distinction to deportation in *Padilla,* it was also careful to note that it would not answer whether the distinction was an appropriate one for other ineffective assistance of counsel claims."); *United States v. Johnson*, 272 F. Supp. 3d 728, 731 (D. Md. 2017) ("[I]n declining to address the direct-collateral distinction more broadly, [the Supreme Court] generally left unaltered the plethora of lower court precedent applying the distinction in other contexts.").

However, recognizing the "unique nature of deportation," the Supreme Court held that the "collateral versus direct distinction [was] ill-suited to evaluating a *Strickland* claim concerning the specific risk of deportation." *Padilla*, 559 U.S. at 366.  Three factors influenced that conclusion: (1) "deportation is a particularly severe penalty," *id.* at 365 (internal quotation market omitted); (2) deportation is "innately related to the criminal process," *id.* at 365; and (3) "recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders."  *Id.* at 366.  The Supreme Court therefore held that, unlike other advice relating to collateral consequences, "advice

regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel." *Id.* at 366.

Since *Padilla* was decided in 2010, attorneys have been required to provide criminal defendants with advice on two types of matters. First, because the Supreme Court has not overruled the Ninth Circuit's distinction between direct and collateral consequences, attorneys must advise their clients about the direct consequences of a conviction. A prison term is an example of a direct consequence. Second, attorneys must also provide guidance about topics that, because of their "unique nature," are not susceptible to the traditional distinction between direct and collateral consequences. Neither avenue offers Turner the relief he seeks.

The loss of a medical license is a collateral consequence of a criminal conviction. "'The distinction between a direct and collateral consequence of a plea turns on whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment.'" *Fry*, 322 F.3d at 1200 n.1 (quoting *Torrey v. Estelle,* 842 F.2d 234, 236 (9th Cir. 1988)). According to Lype, Turner's own expert, although the Texas medical board must revoke a physician's license after a felony conviction, the board has the option of probating the mandatory revocation order. A probated order can mitigate the effect of a revocation

56

by allowing the physician to continue to practice medicine in Texas under specified conditions.  Whether to probate a revocation is a discretionary matter, and the exercise of that discretion depends largely on the circumstances of a particular case.  In short, the loss of Turner's medical license is neither a direct, nor an immediate, nor even a largely automatic consequence of his conviction.

Moreover, "'[i]n many cases, the determination that a particular consequence is "collateral" has rested on the fact that it was in the hands of another government agency or in the hands of the defendant himself.'"  *Fry*, 322 F.3d at 1200 n.1 (quoting *Torrey,* 842 F.2d at 236).  Because it is the Texas medical board, not this court, that has the authority to revoke Turner's medical license, that revocation is not a direct consequence of his conviction.  *See id.*

Nor is the loss of a medical license comparable to the "unique penalty" of deportation.  None of the factors that the Supreme Court cited in *Padilla* is present here.  The loss of a medical license is not, in severity, "the equivalent of banishment or exile."  559 U.S. at 373 (internal quotation marks omitted).  Nor has the legal system "enmeshed criminal convictions and the penalty of [the loss of a medical license]."  *Id.* at 365.  While the Texas medical board may tie a felony

conviction to such a penalty, the loss of a professional license is not "innately related to the criminal process." *Id.*

And finally, as stated previously, the loss of Turner's medical license is not an "automatic result." *Id.* at 366. The loss of a medical license therefore does not fall within kind of the unique penalties addressed by *Padilla*. *See United States v. Youngs*, 687 F.3d 56, 62 (2d Cir. 2012) ("the concerns expressed by the Supreme Court in *Padilla* as to deportation in the context of adequate counsel under the Sixth Amendment do not apply to such a remote and uncertain consequence as civil commitment"); *Johnson*, 272 F. Supp. 3d at 733 (applying these factors and concluding that trial counsel did not have a duty to warn a criminal defendant that a state guilty plea could be used against them in a subsequent federal trial); *see also Reeves*, 695 F.3d at 640 ("*Padilla* is rife with indications that the Supreme Court meant to limit its scope to the context of deportation only. The Court repeatedly underscored the severity of deportation before deciding that an attorney must always inform his client of that unique risk."); *cf. Chaidez*, 568 U.S. at 349 n.5 ("effects of a conviction commonly viewed as collateral include . . . disqualification from public benefits").

In sum, because the possibility that Turner will lose his medical license is a collateral consequence of his

conviction, trial counsel did not have a duty to advise Turner on that subject.  Counsel's failure to inform Turner that a felony conviction might make him more likely to lose his license did not constitute ineffective assistance.

> **2.   Turner Does Not Establish that He was Prejudiced by Counsel's Failure to Inform Him About the Impact a Conviction Might Have on his Medical License.**

Even if trial counsel did have a duty to explain how a conviction might affect Turner's ability to practice medicine in Texas, Turner does not establish prejudice.  "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 147 (2012); *see also Lafler v. Cooper*, 566 U.S. 156, 174 (2012) ("As to prejudice, respondent has shown that but for counsel's deficient performance there is a reasonable probability he and the trial court would have accepted the guilty plea.").  That inquiry, which "focuses on a defendant's decisionmaking," requires a "case-by-case examination of the totality of the evidence." *Lee v. United States*, 137 S. Ct. 1958, 1966 (2017) (internal quotation marks

omitted).[17]   "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies.  Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."  *Id.* at 1967.

The issue of whether that test involves objective or subjective considerations has divided courts.  *Heard v. Addison*, 728 F.3d 1170, 1184 (10th Cir. 2013) (noting that this issue has "caused some confusion among the circuits").  The Supreme Court has held that "a petitioner must convince the court that a decision to reject [or accept] the plea bargain would have been rational under the circumstances."  *Padilla*, 559 U.S. at 372; *see also Lee*, 137 S. Ct. at 1968 (discussing whether it would have been rational for the defendant to reject a plea).

Several circuits have concluded that the Supreme Court's focus on what would have been rational for someone in the defendant's circumstances makes the test an objective one. *See United States v. Akinsade*, 686 F.3d 248, 261 (4th Cir. 2012)

---

[17] *Lee* involved a defendant who accepted a plea deal, then later said that he would *not* have accepted it if he had been properly advised.  137 S. Ct. at 1966.  However, the same considerations apply when a defendant rejects a plea deal and later says that he would have accepted it if he had been properly advised.  *See, e.g.*, *Gomez v. Sullivan*, 2020 WL 6119514, at *10 (N.D. Cal. Oct. 16, 2020) (applying the same test in the "accepted plea context" and the "rejected plea context").  In either situation, the question is whether there is a reasonable possibility that the defendant would have made a different decision.

("[T]his is an objective test."); *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012) ("The test is objective, not subjective."); *see also Dupree v. Warden*, 2008 WL 1944144, at *11 (C.D. Cal. Apr. 30, 2008) ("This analysis does not turn on Petitioner's subjective state of mind but on objective considerations."); *cf. Sanchez v. United States*, 50 F.3d 1448, 1454 (9th Cir. 1995) ("[T]he issue in a case involving a guilty plea is whether there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant would have refused to plead and would have gone to trial . . . . [T]he test for whether the defendant would have chosen to go to trial is an objective one.").

Other circuits have disagreed. The Tenth Circuit, for instance, has interpreted the requirement that a defendant convince the court that a decision to change his plea would have been rational as setting an "objective *floor*, somewhere below [the] more demanding requirement that the defendant show a *reasonable probability* that he would have gone to trial absent counsel's errors." *Heard*, 728 F.3d at 1184 (emphases in original) (internal brackets and quotation marks omitted). However, once a defendant overcomes that "objective floor," the Tenth Circuit conducts a subjective inquiry into "whether *the defendant* would have changed his plea." *Id.* (emphasis in original); *see also United States v. Chan*, 732 F. App'x 501, 503

(9th Cir. 2018) (remanding a coram nobis case to the district court to determine whether a defendant's statement that she actually would have changed her plea was credible); *Lozano v. United States*, 802 F. App'x 651, 654 (2d Cir. 2020) ("[T]he Supreme Court requires a district court to apply a subjective standard and determine whether there is a reasonable probability that the particular complaining defendant would not have pleaded guilty had he known of his plea's deportation consequences."). That inquiry turns in large part on objective factors, such as the strength of the government's case, *see Lee*, 137 S. Ct. at 1966, but the defendant ultimately must make a credible showing that he himself would have changed his plea.

In *Lee*, the most recent Supreme Court decision on this issue, the Supreme Court analyzed whether the defendant, who had initially accepted a plea offer, could have rationally rejected the plea and taken his chances at trial. 137 S. Ct. at 1968-69. But the Court also "ask[ed] what [the] individual defendant *would have done*," 137 S. Ct. at 1966-68 (emphasis added), an inquiry that suggests that the Court also required the defendant to show that he actually would have changed his mind and gone to trial. *See also id.* at 1966 (stating that the inquiry "focuses on a defendant's decisionmaking"). The Tenth Circuit's approach in *Heard*, which requires a defendant to show that it would have been rational for the defendant to change his mind *and* that he

would have done so, best captures that analysis.  In an unpublished opinion, the Ninth Circuit has similarly suggested that a defendant's credibility was part of the analysis, remanding the case to the district court.  *Chan*, 732 F. App'x at 503.  There would have been no reason for the Ninth Circuit to remand to the district court to make a credibility determination under an objective test.  *See id.*

Applying that test here, this court does not need to determine whether Turner could have rationally accepted the Government's plea deal if he had known that a misdemeanor conviction would be much less likely to lead to the loss of his medical license.  Even if that decision would have been rational, Turner does not satisfy the second part of the test. He does not show that he would have accepted the proposed plea agreement.  *See id.*

At the coram nobis evidentiary hearing, Turner testified that, in evaluating the proposed plea deal, he was very much concerned about his ability to practice medicine. *See, e.g.*, ECF No. 204, PageID # 2374.  He said that if he had known that he probably could have continued to practice medicine with a misdemeanor conviction, he would have accepted the Government's plea deal to protect his medical license.  *See id.* at 2381-2383.  For several reasons, this court does not find that testimony credible.

Lype did testify that a Texas physician who is convicted of a misdemeanor is much more likely to be able to continue practicing.  But he also acknowledged that there are some similarities in how the Texas medical board considers felonies and misdemeanors.  While the board is required to revoke the license of any physician convicted of a felony, it retains the discretion to probate (i.e., ameliorate) any revocation.  And, in the misdemeanor context, the board retains the discretion to punish a physician.  In either case, the board considers the facts underlying a conviction.  *See* ECF No. 198, PageID # 2186.  Thus, even if he had accepted the plea deal involving a misdemeanor assault charge, the Texas medical board would have considered the facts underlying his conviction.  He would still have faced a risk to his medical license.

That is particularly significant because Turner believed that he was more likely to prevail at trial on the felony charge.[18]  ECF No. 204, PageID # 2405; *see also id.* at 2362.  Of course, Turner also believed that he was innocent of the misdemeanor assault charges.  The jury either credited his testimony at trial stating that he had not committed either assault, or the jury decided that the Government had not

---

[18] Turner also argues that he would have thought he was likely to be convicted of the felony charge if he had known about the jury instruction defining intimidation.  This court addresses that assertion later in this order.

established guilt beyond a reasonable doubt with respect to the assault charges.  Before the verdict, Turner, believing himself not guilty, clearly would not have seen much benefit in the plea deal.  In his mind, the deal would have allowed him to avoid a conviction on a charge that he did not think he would be found guilty of anyway, while requiring him to accept a misdemeanor conviction on charges that he also believed that he could prevail on and that could have prevented him from practicing medicine.  In short, even if Turner had known that a felony conviction was more likely to lead to the loss of his license, he still would have thought he had something to gain from rejecting the plea deal and taking his chances at trial.

More significantly, this court finds that Turner would not have wanted to agree or have been able to agree that he was at fault for his behavior on the American Airlines flight.  A plea would have required him to admit to having committed a crime.  Turner's claim that he would have been able to accept responsibility is contradicted by his behavior throughout this case.  When an FBI case agent jailed him, Turner filed a complaint with the FBI stating that a sixth grader could have conducted a better investigation.  Def's Ex. 14, at 1-2.  Every time Ignacio warned Turner about the inculpatory nature of other witnesses' statements, Turner responded by rejecting or minimizing those statements.  And after trial, Turner told his

probation officer that the evidence was "so lacking and contradictory" that he believed that this judge would "throw [the conviction] out."  Def's Ex. 62, at 1.

In other words, as Ignacio stated, Turner believed that he had been wronged by the indictment against him, and he "wanted his day in court" to prove his innocence.  ECF No. 198, PageID # 2137-38.  This court therefore finds that Turner would not have accepted a plea agreement that denied him that chance, required him to admit his guilt, and still carried some risks to his medical license.  Turner's assertions that he would have accepted the plea deal if he had known the matters Lype testified to lack credibility.  Even if Turner's attorney had had a duty to explain to him that he probably could continue practicing medicine in Texas with a misdemeanor conviction, Turner does not establish prejudice from that failure.

> **3.   Turner is not Entitled to Coram Nobis Relief Based on any Alleged Errors Relating to the Jury Instruction on Intimidation.**

Turner also raises several claims of ineffective assistance that relate to the court's instruction defining the intimidation element of the offense of interference with a flight attendant.  To reiterate, that instruction informed the jury that:

> A flight attendant may be "intimidated" by the use of words or actions that place the flight attendant in reasonable apprehension

of bodily harm, either to the flight
attendant *or to another*, or by the use of
words or actions that make the flight
attendant fearful *or make the flight
attendant refrain from doing something that
the flight attendant would otherwise do, or
do something that the flight attendant would
otherwise not do, or interfere with or
lessen the flight attendant's ability to do
something.*

One person in a group can be intimidated by
threats directed at the group in general.
The government does not have to prove that
the flight attendant was in fact frightened
for her own physical safety in order to
prove that the defendant performed the
criminal act of intimidation. It is
sufficient that the conduct and words of the
defendant would place an ordinary,
reasonable person in fear.

ECF No. 46, PageID # 146 (emphasis added).  The parties jointly

proposed that instruction, which was based on the Eleventh

Circuit's 2003 model instruction.  ECF No. 31, PageID # 76.

Turner contends that the instruction contained two

flaws.  First, he argues that inclusion of the phrase "or to

another" in the first sentence of the instruction erroneously

permitted the jury to conclude that Goralska was intimidated if

she "believed that one passenger might harm another passenger,"

even if she was not afraid that she herself would be harmed.

ECF No. 147, PageID # 1599-60.  Second, he contends that the

final disjunctive clause in the first sentence would have

permitted the jury to find him guilty even if he did not

intimidate Goralska.  *Id.* at 1598—99.  Neither assertion entitles him to relief.

    a.  **The Instruction Correctly Informed the Jury that a Flight Attendant Could be Intimidated by Fear of Bodily Harm to Another.**

Turner first contends that trial counsel was ineffective because he failed to object to the inclusion of the phrase "or to another" in the first sentence of the intimidation instruction.  With respect to this claim, Turner does not establish either deficient performance or prejudice.

Counsel had no obligation to object to the "or to another" language.  A victim of a crime can be intimidated by the fear that someone else will be harmed.  Consider a gangster who takes someone who has witnessed a crime for a car ride, and, while holding a pistol, tells the witness that if he does not lie on the gangster's behalf, his family will be harmed.  Even if the witness did not feel afraid for his own safety, the threat to his family would certainly qualify as intimidation. *Cf. United States v. Shively*, 927 F.2d 804, 812 (5th Cir. 1991) (holding, in a case involving similar facts, that "the evidence does show the intimidation of a witness").  Or take a bank robbery in which the perpetrator holds a gun to the head of a bank teller's coworker and says, "open the safe or I will kill him."  Even if the teller does not personally fear injury, he is

likely to be intimidated by the possibility that the robber will shoot his friend and coworker.

It is therefore unsurprising that none of the authorities cited by Turner holds that intimidation only occurs if the victim fears bodily harm to himself.  Turner relies primarily on the Ninth Circuit's decision in *United States v. Meeker*, 527 F.2d 12 (1975).  In *Meeker*, the Ninth Circuit indicated that a defendant would not be guilty of intimidation if a pilot "unnecessarily saunter[ed] back to the cabin to intermeddle officiously in a heated dispute between passengers." *Id.* at 15.  In that scenario, the pilot plainly was not intimidated, because he "sauntered" over to the passengers to intervene.  That example does not show that a flight attendant cannot be intimidated when she *does* become afraid of the possibility that a passenger will injure another passenger.[19]

Turner also notes that the most recent version of the Eleventh Circuit's model jury instructions does not include the

---

[19]   Turner cites several Ninth Circuit cases addressing the crime of bank robbery by intimidation in violation of 18 U.S.C. § 2113(a).  In such cases, the Ninth Circuit has approved the following jury instruction: "To take, or attempt to take, 'by intimidation' means willfully to take, or attempt to take, in such a way that would put an ordinary, reasonable person in fear of bodily harm." *United States v. Alsop*, 479 F.2d 65, 67 n.4 (9th Cir. 1973); *see also United States v. Selfa*, 918 F.2d 749, 751 (9th Cir. 1990); *United States v. Hopkins*, 703 F.2d 1102, 1103 (9th Cir. 1983).  None of those cases addressed a scenario involving a victim of a crime who might be intimidated by the threat of harm to another person.

"or to another" wording.  *See* 11th Cir. Pattern Jury Instructions (2020).  However, the model instructions still state that intimidation occurs when a defendant does "something to make another person fearful."  *Id.*  And, as discussed above, threatening bodily harm to another person can cause a victim to become fearful.  The more recent language does not suggest that the older model instruction was incorrect.[20]

In sum, Turner has not shown that the jury instructions improperly defined intimidation by including the phrase "or to another."  Failing to object to a jury instruction that correctly states the law is not deficient performance.

In any event, even if he had established deficient performance, Turner has failed to show that he suffered prejudice from the inclusion of the phrase "or to another" in the intimidation instruction.  *See James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) ("An ineffective assistance of counsel claim based on counsel's failure to object to a jury instruction requires a showing of prejudice.").  Under *Strickland*, Turner must demonstrate "a reasonable probability that, but for

---

[20] The annotations and comments to the 2010 and 2016 editions of the Eleventh Circuit model jury instruction are silent as to the reason for the change in language for this model instruction. The annotations and comments do not cite to any case law as a basis for changing the language at issue (i.e., deleting "or to another").  Possibly the Eleventh Circuit jury instructions committee was simply trying to track appellate language more closely without changing the substantive definition and examples in this model instruction.

counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, which, in this context, means a reasonable possibility that a correctly instructed jury would not have found intimidation of Goralska.[21]

Turner's attempt to make that showing is precluded by the Ninth Circuit's opinion denying his direct appeal, which stated:

> In any event, any error would be harmless beyond a reasonable doubt.  Turner, among other things, threatened to "break the neck" of other passengers during the altercation. *The evidence was overwhelming that Turner's intentional behavior intimidated the flight attendant by causing her to reasonably fear for the safety of her passengers and herself*, thereby diverting her from performing other duties aboard the aircraft.

*Turner*, 754 F. App'x at 665 (emphasis added).[22]  The Ninth Circuit's conclusion that the evidence overwhelmingly showed

---

[21]  Turner concedes that he must make this showing.  *See* ECF No. 147, PageID # 1601 ("Trial counsel's deficient performance thus satisfies the second prong of the *Strickland* analysis as there is a reasonable probability that a correctly instructed jury would not have found Dr. Turner guilty on Count One.").

[22]  Turner argues that prejudice is apparent from the jury's acquittal of him on the two assault charges.  *See* ECF No. 147, PageID # 1604.  An acquittal may indicate that the jury felt that there was a lack of proof beyond a reasonable doubt that Turner spat on C.M. or pushed R.A.'s seat (the bases for the assault charges).  However, Turner himself admitted to having threatened to break R.A's neck, and Goralska believed that he had said "I'm going to break your fucking neck."  ECF No. 95, PageID # 632-33.  Turner's acquittal on the assault charges does

that Turner intimidated Goralska is binding on this court.  It is now law of the case.  Turner cannot be said by this court to have been prejudiced by an error in the intimidation instruction in the face of overwhelming evidence.  *See United States v. Nguyen*, 565 F.3d 668, 677–78 (9th Cir. 2009) (holding that the omission of an element in jury instructions did not affect the defendant's substantial rights because of the "overwhelming evidence" pertaining to the omitted element).

> **b.   Turner Does Not Establish that the Definition of "Intimidation" was Erroneous, or that He was Prejudiced by It.**

Turner's second challenge to the instruction defining "intimidation" focuses on the final clause in the instruction's first sentence.  He contends that the instruction allowed the jury to find him guilty if he "ma[de] the flight attendant refrain from doing something that the flight attendant would otherwise do, or do something that the flight attendant would otherwise not do, or interfere[d] with or lessen[ed] the flight attendant's ability to do something."  *See* ECF No. 147, PageID # 1598-99.  He says the instruction therefore allowed the jury to find him guilty even if he had not made Goralska fearful of anything.  *See id.*

---

not contradict the Ninth Circuit's holding that the evidence overwhelmingly established intimidation.

Based on this alleged error, Turner raises two alternative claims of ineffective assistance.  He contends that, if the court concludes that the jury instruction was correct, then counsel provided ineffective assistance before trial by not informing Turner that he was almost certain to be convicted, because his actions probably caused Goralska to, for instance, "refrain from doing something that [she] would have otherwise done."  *See id.* at 1593, *see also* ECF No. 182, PageID # 1947-48.  Alternatively, if the court concludes that the jury instruction misstated the law, then he asserts that trial counsel was ineffective for having agreed to the instruction in the first place.  ECF No. 147, PageID # 1598-99.  Neither claim entitles Turner to relief.

The court begins by noting that Turner does not establish that the intimidation instruction was erroneous.  The intimidation instruction must be read in conjunction with the separate instruction setting forth the elements of the interference charge.  That separate instruction listed three elements: (1) the defendant had to have been on an aircraft in flight within the special aircraft jurisdiction of the United States; (2) the defendant had to have intimidated a flight attendant of the aircraft; and (3) the intimidation had to have interfered with the performance of the duties of the flight attendant of the aircraft or lessened the ability of the

73

attendant to perform those duties. ECF No. 46, PageID # 144. Turner argues that the intimidation instruction set up a kind of circular process whereby the Government could satisfy the second element by showing that the flight attendant failed to do something such as attend to passengers and then satisfy the third element by pointing to the same failure to attend to passengers as constituting the interference with the performance of the flight attendant's duties. But, as this court noted in its Order Denying "Motion for Bail Pending Appeal," ECF No. 85, the second and third elements implicate the difference between affect and effect. That is, the second element addresses how the defendant's actions affect the flight attendant's mental state, while the third element addresses the effect of the defendant's actions on the flight attendant's actions. The third element requires a causal connection between the defendant's intimidation and what the flight attendant did or did not do. The elements are not circular and instead have different requirements.

Turner complains that, even if the instruction jointly proposed by the parties was correct,[23] counsel was ineffective in failing to explain to him during the plea bargaining process

---

[23] If the jury instruction was incorrect, Turner must rely on a different argument. No attorney has a duty to inform a client about an *incorrect* interpretation of the law. Under those circumstances, the attorney's error is in proposing an erroneous jury instruction, not in failing to tell the client about it.

that he was "almost certain to be convicted at trial."  ECF No. 182, PageID # 1947-48; *see also* ECF No. 147, PageID # 1593 ("The fact is, under the jury instruction on interference which [trial counsel] believed applied . . . Dr. Turner was essentially *guaranteed* to be convicted of the charge of interference with a flight attendant.").  Turner does not establish deficient performance.  Turner is essentially arguing that trial counsel should have guaranteed a conviction.  No law requires trial counsel to guarantee a particular result in a jury trial.

Nor can Turner show that he was prejudiced.  To reiterate, to establish prejudice, Turner must demonstrate a reasonable probability that he would have accepted the plea offer if he had been afforded effective assistance of counsel. *Frye*, 566 U.S. at 147; *see also Lafler*, 566 U.S. at 174.  Turner must therefore show that it would have been objectively rational for him to have accepted the plea offer and that he actually would have accepted the offer.  *Heard*, 728 F.3d at 1184; *see also Lee*, 137 S. Ct. at 1966-69.  Again, this court does not have to decide whether Turner could have rationally accepted the plea offer if he had known about the definition of intimidation, because this court finds that he would not have accepted it.

The Supreme Court's decision in *Lee* is instructive. In *Lee*, the defendant was a South Korean citizen who had lived in the United States for more than 35 years.  *See id.* at 1963.

75

He agreed to plead guilty to one count of having possessed ecstasy with intent to distribute only after his attorney repeatedly assured him that he would not be deported as a result of his plea. *Id.* His attorney was wrong, and Lee "quickly learned" that he had "pleaded guilty to what qualifies as an 'aggravated felony' under the Immigration and Nationality Act" and was therefore "subject to mandatory deportation." *Id.* He brought a § 2255 motion to vacate his guilty plea based on his attorney's ineffective assistance. *Id.*

Before the Supreme Court, the Government argued that Lee could not establish that he would have gone to trial if he had known that he would be deported, because the evidence against him was so overwhelming that no rational defendant would have risked a trial. *Id.* at 1968. The Supreme Court disagreed. It held that, because deportation was the "determinative issue" for Lee in plea discussions, even if it was *almost* certain that he would be convicted at trial, it would have been rational for Lee to reject the proposed plea deal and "hold[] on to some chance of avoiding deportation." *Id.* at 1969.

This case presents the opposite scenario. This court has already ruled earlier in this order that counsel had no duty to advise Turner about the impact that a guilty plea would have on his medical license. And Turner has admitted that he believed that a misdemeanor conviction could prevent him from

practicing medicine.  ECF No. 204, PageID # 2375-77; *see also* ECF No. 147-2, PageID # 1618.  He has also indicated that the potential loss of his license was his "*primary concern*."  ECF No. 147-2, PageID # 1619 (emphasis added).  Turner had a strong incentive to reject the Government's plea deal even had he known what the intimidation instruction stated.

Turner nevertheless argues that, if only he had known the definition of "intimidation," he would have indeed accepted the plea deal because he would have realized that conviction was nearly certain.  That is not necessarily the case.  Under the court's instruction, the Government had to prove that Turner "made" Goralska "refrain from doing something that the flight attendant would otherwise do" or lessened her "ability to do something."  ECF No. 46, PageID # 146.  Because Turner thought that he did nothing wrong, he would have counted on being able to convince the jury that he had not *made* Goralska do anything.

As discussed previously, the evidence overwhelmingly shows that, prior to trial, Turner refused to accept that he had acted inappropriately.  He wanted the chance to prove his innocence.  He would have thought that accepting the plea deal on the ground that the intimidation instruction guaranteed conviction would have put his medical license in jeopardy and would have forfeited his day in court.  Turner's testimony that he nevertheless would have accepted the Government's proposed

plea deal is not credible.  Turner does not show that he was prejudiced by counsel's failure to discuss the jury instructions with him before trial.

Finally, even if the intimidation instruction was erroneous, Turner does not prevail on his alternative argument that trial counsel was ineffective in failing to object to the instruction.  Irrespective of whether or not trial counsel should have objected to the challenged language, Turner does not establish prejudice from the failure to object.  As stated previously, to satisfy *Strickland*'s second prong Turner must demonstrate a reasonable possibility that what he would view as a correctly instructed jury would have found that he had not intimidated Goralska.  The Ninth Circuit has already held that the evidence that Turner intimidated Goralska was overwhelming. *See Turner*, 754 F. App'x at 665.  The Ninth Circuit expressly noted that Goralska did indeed "reasonably fear for the safety of her passengers and herself." *Id.*  Thus, even if, as Turner argues, the instruction allowed the jury to convict him without a finding that Goralska was fearful, Turner was not prejudiced because Goralska had a reasonable fear.  On this point, the Ninth Circuit had the trial record before it, and no additional evidence on this subject has been presented to this court.

### 4.   Turner Does Not Establish Ineffective Assistance Based on Trial Counsel's Alleged Failure to Investigate.

Turner's third claim of ineffective assistance also relates to the advice he received during the plea-bargaining process.  According to Turner, trial counsel was ineffective because he "never hired an investigator, never interviewed any potential witnesses, and never conducted any investigation into any aspect of [Turner's] case" before discussing the Government's proposed plea deal with Turner.  ECF No. 147, PageID # 1592; *see also* ECF No. 182, PageID # 1946 (arguing that trial counsel "failed to investigate the case or discuss the evidence with Turner").  To start with, the specific issue Turner has most complained about is Ignacio's failure to interview the passengers across the aisle from Turner.  But those passengers gave statements to the FBI that were highly unfavorable to Turner.  A trial attorney seeing that those witnesses had a negative impression of the defendant could have reasonably decided that those individuals were not worth following up with because they were unlikely to be people who would be called by the defendant at trial or who would yield evidence that the defendant might find helpful.

Even if the failure to investigate was not a sound strategic decision (e.g., if it flowed from negligence), that would not suffice to establish ineffective assistance.  As

stated earlier, Turner must establish prejudice by showing "a reasonable probability [he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel." *Frye*, 566 U.S. at 147.  When counsel allegedly fails to investigate the strength of the government's case, that standard logically requires a defendant to show that the investigation would have revealed some evidence that may have caused the defendant to change his mind.  *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985) ("[W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea.").  Turner has not identified any such evidence.[24]

        As this court noted earlier in this order, Turner was unable to contact the passengers across the aisle in connection with his coram nobis motion.  He may be understandably frustrated on this point, but the fact remains that there is no

_____

[24] In fact, as discussed earlier in this order, Turner stated that he would have changed his plea to guilty if he had seen the FBI's summary of its interview with the two passengers sitting across from him.  Turner's failure to review those summaries is not the result of an incomplete investigation.  Turner is arguing that Ignacio had those summaries in his possession, but did not share them.  In any event, this court has already held that Turner's claims that he would have changed his plea if he had seen the summaries are not believable.

evidence in the record showing that a more thorough investigation would have produced any evidence that would have benefitted Turner.  Moreover, there is no evidence suggesting that trial counsel might have had better luck.  In short, Turner does not show that trial counsel could (much less should) have conducted a more thorough investigation that would likely have changed Turner's response to the Government's plea offer.

### 5.   Turner Does Not Establish Ineffective Assistance Based on Trial Counsel's Failure to Request a Limiting Instruction.

Finally, Turner argues that trial counsel should have "requested a curative instruction to address the evidence already introduced in support of the dismissed theory [that Turner interfered with the copilot in addition to Goralska]." ECF No. 147, PageID # 1604.  Turner maintains that a limiting instruction was necessary because the Government introduced evidence about the effect of the altercation on the copilot that was "entirely unrelated to the alleged intimidation of [Goralska] or interference with her duties."  *Id.*

There was evidence at trial that the copilot, upon hearing about Turner's altercation with other passengers, locked the cockpit door and remained in the cockpit for the remainder of the flight.  Once the court dismissed the portion of the interference count that alleged that Turner had interfered with the flight crew (meaning the copilot), the jury was not asked to

decide anything relating to the copilot.  It is not at all clear that the evidence of the copilot played any role in the verdict. Even if trial counsel's performance was deficient, Turner does not establish prejudice.  In rejecting his claim that this court should have given a curative instruction *sua sponte*, the Ninth Circuit held that "[d]ue to the strength of the government's case against him and the district court's careful and otherwise appropriate instruction of the jury, the lack of a limiting instruction was not plain error."  *Turner*, 754 F. App'x at 665. For the same reasons, Turner does not show that, absent prejudice, counsel's failure to request a limiting instruction constituted ineffective assistance.

> **D.  Turner is Not Entitled to the Relief he Requests.**

Because this court is denying Turner's coram nobis petition on the merits, it does not reach Turner's requested relief.  The court nevertheless notes that the relief Turner seeks is exceptionally odd.

In coram nobis cases, the remedy is often expungement of the conviction.  Turner now asks the court to, in his words, "return [him] to the status quo ante."  ECF No. 204, PageID # 2412.  That is, Turner asks this court to place him in the same position that he was in before he purportedly received ineffective assistance of counsel by vacating his conviction, reinstating the charges against him and the Government's plea

82

offer, and allowing him to plead guilty to one of the two misdemeanor charges.  *See* ECF No. 147, PageID # 1605.  This would put this court in the odd position of having to sentence Turner on a charge he was acquitted of.

Turner's odd proposed remedy is actually a change from the remedy he initially proposed.  The original relief sought was a new trial, which this court repeatedly questioned given Turner's completion of the sentence imposed by this court and the risk of a new sentence following any retrial.  *See* ECF Nos. 132, 164.

In any event, both proposals are precluded by the double jeopardy clause.  Turner has *already been acquitted* of the misdemeanor charges that he seeks to have reinstated. Although Turner told the court he would waive his double jeopardy protection, he cites no case suggesting that a court should rely on such a waiver and reinstate the charges of which a defendant has been acquitted.  This court sees no reason to order such "relief."  Even if this court had ruled in favor of Turner, it would not have granted him the relief he has requested.[25]

---

[25] Of course, if Turner had prevailed, this court could have fashioned other relief that would have corrected the underlying injustice but did not conflict with constitutional protections.

## IV.   CONCLUSION.

Turner's petition for a writ of coram nobis is denied. Turner's motion to strike and bar consideration is also denied.

The Clerk is directed to enter judgment for the United States in Civil No. 20-00286 SOM-KJM and to close that case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 21, 2021.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

*William C. Turner v. United States of America*, CRIM. NO. 16-00207 SOM, CIV. NO. 20-00286 SOM-KJM; ORDER DENYING DEFENDANT'S PETITION FOR WRIT OF ERROR CORAM NOBIS AND DENYING MOTION TO STRIKE AND BAR CONSIDERATION